Freedman, J.
This is an action for the foreclosure of a mortgage to the extent of a balance of $1,770 claimed to be still due upon it. The mortgage originally covered a number of lots, but foreclosure is prayed for only against a certain lot owned by the defendants Woodruff, Conklin & Bay.er, who are the only litigating defendants.
The questions involved are somewhat novel and interesting, as well as complicated, and in consequence thereof they received special attention.
On October 6, 1877, Daniel R. Kendall made a deed to Niebuhr of a number of lots on One-Hundred-and-Twenty-first street in the city of New York, presenting a frontage on said street of 187 feet, and received from Niebuhr the latter’s bond and mortgage on said lots for $29,920—which was the purchase price. Contemporaneously therewith the said parties entered into a written contract whereby Niebuhr agreed to erect on said lots eleven houses, each of the dimensions of seventeen by forty-five feet, as therein provided, and to *546 have them completed before May 1,1878, and whereby Kendall agreed to make advances as follows, viz. :
“ When all the houses are enclosed, girders and posts in cellar, leaders connected with sewer, bridging done, window frames in, coping on roof, and chimneys, skylight and scuttle on, the roof on all completed, an advance to be made on each house of $1,200.00
“ When floors are laid, studding, browning and scratch coating done, sewer connections made; grounds or james set for doors and windows in all the houses, . $500.00
“When the hard finishing and trimming is done, stairs up, sashes hung and glazed, mantels in, brown stone stoops completed, and doors all hung in all the houses,....... $600.00
“When said houses are fully completed, including warming apparatus, grates and mantels, flagging and all yard work done, front and rear, in each house, . . $750.00
The contract- further provided as follows, viz. :
“For each of the above advances the said Kendall agrees to receive the bond and mortgage of the said Niebuhr with the signature of his wife, payable on or before May 1, 1878, with interest at 7 per cent, and usual interest, tax, assessment-, and insurance, clauses, provided all the said houses and lots are free from all 'grants, mortgages, liens, judgments, or otherwise, at the time the said payments are due. Interest on all said mortgages, mentioned in this agreement, with cost of drawing and recording the samé, and all taxes and assessments then confirmed, to be taken out of last-mentioned payment. On the final completion of all of said houses the said Kendall agrees to receive the bond and mortgage (containing usual clauses) of said Niebuhr for $5,770 on each house and lot, being *547 $2,720 for the cost of the lot, and $3,050 for the advance, making together $5,770, payable, with 7 per cent, interest semi-annually, in one year if negotiated with an incorporated company, or three years if otherwise. The said Niebuhr to make the said bonds and mortgages payable to such parties as the said Kendall may direct. The said Kendall hereby agrees (the said mortgage for $5,770 having been recorded) to remove and cancel all the other mortgages mentioned in this agreement, provided that each of said houses and lots are free from all incumbrances by grants, mortgages, liens, judgments, or otherwise. The said bond and mortgage for $5,770, each to be divided at the option of said Kendall into two mortgages, in aggregate for the said sum of $5,770,” &c.
On May 16, 1878, the following state of facts existed :
Kendall had advanced to Niebuhr the first two installments called for by the contract, amounting in the aggregate to,.......$18,700.00
which, with the price of the lots, viz.: 29,920.00
made the sum of,.....$48,620.00
Niebuhr had executed to the New York Life Ins. Co. eleven mortgages, one on each house and lot, and each for $4,000, for which Kendall had received the money upon a surrender, as may be assumed, of his purchase-money mortgage, ....... $44,000.00
This left a balance due to Kendall of, $4,620.00.
Kendall then made to Niebuhr the third advance called for by the contract, amounting to,......$6,600,00
*548 which made the balance due to Kendall on that day......$11,220.00
For this amount the mortgage in suit was executed by Niebuhr and wife, and the same was duly recorded May 17, 1878, as in the complaint alleged. It was made payable July 1, 1878, and covered the entire premises, subject, however, to the eleven mortgages held by the New York Life Ins. Co. From the description of the premises which was used, it does not appear into how many lots the 187 feet of ground described were laid out, but at the end of the description the following provision occurs: “In case of foreclosure of this mortgage all to be sold in one parcel, or in single lots at option of said Daniel R. Kendall.”
Kendall also testified that it was further agreed that this mortgage was to be held by him as security until he got his final mortgages, namely, eleven second mortgages of $1,770 each, and that upon the receipt of those it was to be discharged.
Niebuhr then went on with the erection of the houses, and the last payment under the contract, amounting to $8,250.00, was made to him by Kendall after September 26, 1878.
As the houses neared completion, Niebuhr made attempts to effect sales, and by October, 1878, he had sold eight of them, with the land upon which each stood respectively. Among them was one which was sold to the defendants Woodruff, Conklin & Bayer by deed recorded August 23, 1878, and upon conditions which will be specially noticed hereafter. As to the other seven, each house and lot was sold, subject to a first mortgage of $4,000 held by the New York Life Ins. Co., and the purchaser, in each case, as a part of the consideration paid, executed a second mortgage for $1,770, which was turned over to Kendall. Upon each of the three houses and lots remaining unsold, Niebuhr *549 executed and delivered to Kendall a second mortgage for the same amount.
The ten mortgages thus received by Kendall were by agreement between him and Niebuhr applied in repayment of the last advance of $8,250 made by Kendall under the contract, and then in payment, to the extent of $9,450, of the mortgage of $11,220.
Upon the receipt of each of the said ten second mortgages Kendall released the premises covered by it respectively from the lien of the general mortgage.
The consequence of this course A' dealing was, that in October, 1878, every house and lot had been released except the one purchased by the defendants Woodruff, Conklin & Bayer, against which the general mortgage constituted a lien to the extent of $1,770.
To foreclose that mortgage to the extent named against said premises, the present action was commenced in April, 1879.
Woodruff, Conklin & Bayer, as already stated, purchased the house and lot in question in August, 1878. The deed to them bears no date, but it was recorded August 23,1878. For a consideration therein expressed of “ one dollar (and other good and valuable consideration)” it conveys the premises in question, subject “to two mortgages on said premises, amounting in the aggregate to the sum of five thousand dollars.” The consideration for this deed was, in fact, an indebtedness due by the grantor to the grantees for materials theretofore supplied which had been used for and upon the houses. By their answer these defendants admit that this sum had reference to the mortgage of $4,000, held by the New York Life Ins. Co., and to the proportionate one-eleventh share of the principal sum of the mortgage of $11,220, and they also admit the option secured to Kendall by the last-mentioned mortgage as to the manner in which, in case of foreclosure, the sale is to be made.
*550 They insist, however:
1. That the plaintiff has precluded himself from enforcing the mortgage against the house and lot in question for'the amount of $1,770, or any amount whatever, because the ten releases executed by him operated as a discharge of their house and lot from the lien of the mortgage ; and,
2. That in any event the receipt of the ten second mortgages operated as a payment and satisfaction of the mortgage of $11,220.
As to the first ground:
The general rule undoubtedly is that when a mortgagor sells a portion of the lands which. the mortgage covers, those which he retains become primarily liable for the satisfaction of the debt, and that those which he has conveyed are answerable only for an eventual deficiency; and, as a necessary consequence, that a similar1 equity prevails between purchasers, so that distinct parcels or lots of the mortgaged lands which have been conveyed at different times to different purchasers, are chargeable in the inverse order of their alienation, and must be sold in that order under a decree. The equity which may thus have been created between a purchaser and the mortgagor, or between several purchasers, the mortgagee, when he has a knowledge of the facts, is not permitted to disregard or to disturb, and, with this knowledge, he acts at his own peril when he releases from the lien of the mortgage any portion of the lands which it embraces. If the lands released are primarily liable, and are of sufficient value to satisfy the debt, those previously conveyed are wholly discharged, and in no case can they be charged with any larger sum than the proportion of the debt that may remain unsatisfied when the value of the lands released has been applied and exhausted. (Howard Ins. Co. v. Halsey, 4 Sandf. 565; affirmed, 4 *551 Seld. 271; Gouverneur v. Lynch, 2 Paige, 300; Schryver v. Teller, 9 Id. 173.)
The existence of this equity does not depend upon the nature or extent of the consideration received by the mortgagor for his conveyance, or by the mortgagee for his release ; but before the obligation arises on the part of the mortgagee to regard it, his conscience must be affected by knowledge of the facts upon which the equity depends, or by notice sufficient to put him upon inquiry (Stuyvesant v. Hall, 2 Barb. Ch. 151; Guion v. Knapp, 6 Paige, 35).
The mortgagee is not bound at his peril to ascertain whether any of the mortgaged lands have been aliened, or subsequently incumbered, when applied to to release part of the lands bound by his mortgage, nor is the recording of the mortgagor’s deed to the purchaser notice to the mortgagee of the fact of the conveyance, because by the terms of the statute the constructive notice which arises from the recording of a conveyance of real estate, is limited to subsequent purchasers in good faith and for a valuable consideration of the same real estate, or any portion thereof, whose conveyance shall be first duly recorded (Howard Ins. Co. v. Halsey, 4 Seld. 271; Stuyvesant v. Hall, 2 Barb. Ch. 151).
In the case at bar it sufficiently appears that Kendall not only had sufficient notice to put him upon inquiry, but also knowledge of the conveyance to Woodruff, Conklin & Bayer. According to his own testimony he retained, before accepting the ten mortgages, William McDermot, an attorney, to make the necessary searches, and to prepare the releases, and McDermot did make the searches, found the conveyances on record, and in due time informed Kendall of the result. True, Kendall says that he' cannot recollect that he was informed of the conveyance to Woodruff, Conklin & Bayer specifically, and that he did not pay much atten *552 tion to whom the houses and lots had been sold. But the deed to Woodruff, Conklin & Bayer, having been duly recorded, the presumption is that McDermot in the discharge of his professional duty found it with the rest, and this presumption became conclusive, by the omission of McDermot, when called as a witness, to give testimony to the contrary. This being so, the knowledge which McDermot had as attorney before the delivery of the releases was in law equivalent to knowledge on the part of Kendall, even if the facts were not communicated to Kendall (Bank of the United States v. Davis, 2 Hill, 451; Ingalls v. Morgan, 10 N. Y. 178, 184, 185; Dillon v. Anderson, 43 Id. 231, 238; The Distilled Spirits, 11 Wall. 356; Bank for Savings v. Frank, 56 How. Pr. 403, 414).
If, therefore, the case at bar fell within the general rule stated, I should reopen the case for the purpose of ascertaining the order of the alienation of the different houses and lots, of ■which there is no evidence, and their value at the time of their respective release, as to which I excluded testimony. But I do not think that the case falls within the rule, and consequently the pursuit of inquiry in the directions mentioned is immaterial. For the same reason it is immaterial whether, in October or .November, 1878, there was, or was not, anything due by Niebuhr to Woodruff, Conklin & Bayer for materials or other things supplied on all or some of the houses, or whether or not there were taxes upon the house and lot purchased by them at the time of the purchase.
The rule of charging the lands in the inverse order of their alienation, or of holding a portion remaining apparently covered by a mortgage discharged, in consequence of the release, by the mortgagee with notice, of the other portion which was primarily liable, is a mere rule in equity. The release to a subsequent purchaser is not a technical discharge of the lands previously *553 conveyed from the lien of the incumbrance. Neither is it an equitable release or discharge, unless, upon the principles of natural equity and justice, it ought thus to operate against the party making the release to the-subsequent grantee (Patty v. Pease, 8 Paige, 278).
In all the reported cases in which the general rule has been enforced against the mortgagee, the latter, when applied to to release part of the lands covered by his mortgage, was at liberty to grant or refuse the application. In the present case the release of the ten houses and lots was not a voluntary one, but one which, under the contract, Kendall was bound to give. If he had refused, Niebuhr or his assigns could have compelled it by action. Nor is the remaining house and lot sought to be held for more than by the terms of the contract it was liable for as its equal proportion of the price of the lots and the moneys advanced to build the houses. Both the contract and the mortgage of $11,220 were anterior to the deed taken by the litigating defendants, and a portion of the money advanced after' the delivery of the said deed was expended in finishing the house bought by them. The record of the mortgage of $11,220, to which Woodruff, Qonklin & Bayer took subject, was notice to them of the existence of a lien enforceable, under certain circumstances, against their house and lot, to the extent of the whole of the sum named in it, and though they may not have had actual notice of the precise amount due, or claimed to be due under it, nor of the terms of the contract, yet by the exercise of due care and diligence they could readily have obtained the necessary information. Moreover, within the principles laid down in Payne v. Wilson (74 N. Y. 348), and wholly independent of the fact that it was agreed that Kimball should have the right to hold on to the mortgage of $11,220 until he got all the mortgages to which he was entitled, from which fact it may be inferred that the intention of the parties was *554 that said mortgage, in case of partial payment, should be kept alive to cover subsequent advances under the contract, not otherwise secured, up to the amount named in it, the contract itself constitutes an equitable mortgage and, in equity, a specific lien upon the houses and lots which, unless released in fact, can be enforced by Kendall against any of the subsequent purchasers from, or creditors of, Niebuhr, to the extent of the amount actually due under it.
Under these circumstances Kendall has the prior equity, and it would be inequitable to enforce the rule referred to against him.
As to the second ground :
Upon this branch of the case the testimony is that in about the month of October, 1878, a settlement took place between Kendall and Niebuhr, in the course of which Kendall accepted the ten mortgages referred to : 1. In satisfaction of the amount of $8,250, advanced by him under the contract subsequent to the mortgage of $11,220 ; and, 2. In payment of the sum of $0,450 on account of the last mentioned mortgage. It certainly was competent for the parties to make this settlement, which was not only fair and equitable in itself, but according to contract; and specific application having been made in the course thereof, the court cannot step in and say that a different application must be made. Woodruff, Conklin & Bayer not only took, as they admit, subject to the proportionate share of the house and lot under the mortgage, without ascertaining the amount of such share, while the record of the mortgage charged them with notice of its existence as a lien to the possible extent of $11,220, but, for reasons already given, they also took subject, whether considered as subsequent purchasers from, or creditors of, Niebuhr, to the equitable mortgage and specific liens in equity of Kendall under his contract, and all that at a time at *555 which the house purchased by them was in an unfinished state. Much that has been said in the discussion of the first point, is also applicable to this branch of the case, but to avoid unnecessary repetition it is sufficient to say that the case is not one in which a subsequent debt has been tacked to the original mortgage, and in which that mortgage, with the debt thus tacked on, is sought to be enforced beyond the amount specifically secured by it against subsequent bona fide purchasers, or creditors for value.
My final conclusion is that in any aspect of the case the plaintiff has the prior equity as against the litigating defendants, and that he is entitled to the usual judgment of foreclosure and sale, as prayed for in the complaint.